## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED AIR LINES, INC.,**<br>**Debtor,** | ) ) ) ) ) | **FILED**<br>JUN 1 0 2004<br>JUDGE JOHN W. DARRAH<br>UNITED STATES DISTRICT COURT |
| **Appellant,** | ) ) | No. 04 C 2839 |
| **v.** | ) ) ) | |
| **HSBC BANK USA AS PAYING**<br>**AGENT, and CITY AND COUNTY OF**<br>**DENVER,** | ) ) ) ) | Hon. Judge John W. Darrah<br><br>Hon. Magistrate Judge Ian H. Levin |
| **Appellees.** | ) | |

**DOCKETED**
**JUN 1 5 2004**

---

## BRIEF OF APPELLANT UNITED AIR LINES, INC.

James H.M. Sprayregen, P.C. (ARDC No. 6190206)
Marc Kieselstein (ARDC No. 6199255)
Todd Gale (ARDC No. 6229288)
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for Plaintiff / Appellant
United Air Lines, Inc.

13

## TABLE OF CONTENTS

A.      **STATEMENT OF THE BASIS OF APPELLATE JURISDICTION** ...........................1

B.      **STATEMENT OF THE ISSUES PRESENTED**................................................1

C.      **STANDARD OF REVIEW** ...........................................................................1

D.      **STATEMENT OF THE CASE**.......................................................................2

    (1)     Background of United's Bankruptcy ........................................................2

    (2)     Background of United's Municipal Bond Adversaries............................3

    (3)     Factual Background for the Denver Adversary Proceeding ...................5

         (a)     Structure of the Denver Transaction ........................................5

         (b)     Power to Issue the Bonds..........................................................6

         (c)     Additional Facts Learned During Discovery ............................7

E.      **SUMMARY OF ARGUMENT**........................................................................8

F.      **ARGUMENT**..............................................................................................8

    (1)     The Financing Portions of the Special Facilities and Ground Lease are not a True Lease. ........................................................................................8

         (a)     The "Facilities Rentals" Were Purposefully Tailored to Repay the Bonds, and Not To Compensate for Use and Occupancy of the Denver Airport..................................................................10

         (b)     The "Facilities Rentals" Are Directly Related to the Amount Financed for Construction, Not the Property's Fair Market Value. .........12

         (c)     The Improvements Financed by the Bonds Were Specifically Purchased For United's Use....................................................13

         (d)     The Financing Portions Were Stylized as a Lease to Gain a Tax Advantage. ..............................................................14

         (e)     United Has Taken On Many Obligations Typical of a Lessor...................15

         (f)     United Will Retain Its Leasehold Interest Upon Satisfaction of the Bonds. ...............................................................................17

i

(2)    The Financing Portions are Severable from the Lease Portions of the Agreement.............................................................................................................18

    (a)    Colorado Law Looks to the Intent of the Parties to Determine Whether a Contract is Severable...................................................................18

    (b)    To Determine Intent, Colorado Courts Also Consider Whether the Consideration is Allocable.......................................................................21

    (c)    A Holding that the Financing Portions Are Not Severable Would Be At Odds with Federal Law. ...............................................................22

G.    **CONCLUSION** ................................................................................................**24**

# TABLE OF AUTHORITIES

**Cases**

*Brooks v. United Airlines,*
Nos. 92CA1657, 92 CA1723, 1994 WL 872958, at *3 (Colo. Ct. App. 1994)................ 19

*Carston v. The County of Cook,*
962 F.2d 749, 751 (7th Cir. 1992) ..................................................................................... 1

*Fuller v. Pep Boys,*
88 F.Supp.2d 1158, 1162 (D. Colo. 2000)....................................................................... 22

*Haroco, Inc. v. Am. Nat'l Bank & Trust,*
38 F.3d 1429, 1439 (7th Cir. 1994) ............................................................................... 22

*Homier v. Faricy Truck & Equip. Co.,*
784 P.2d 798, 801 (Colo. Ct. App. 1988) ....................................................................... 19

*Hoseman v. Weinschneider,*
322 F.3d 468, 473 (7th Cir. 2003) ................................................................................... 1

*In re Country Lake Enter.,*
284 B.R. 223, 225 (Bankr. E.D.N.C. 2002)..................................................................... 22

*In re E-Z Serve Convenience Stores,*
289 B.R. 45, 49 (Bankr. M.D.N.C. 2003)....................................................................... 23

*In re GP Express Airlines, Inc.,*
200 B.R. 222, 227 (Bankr. D. Neb. 1996) ....................................................................... 19

*In re Hotel Syracuse, Inc.,*
155 B.R. 824, 841 (Bankr. N.D.N.Y. 1993) ............................................... 9, 10, 12, 13, 17

*In re Howe,*
78 B.R. 226, 231 (Bankr. S.D. 1987)............................................................................... 23

*In re KAR Dev. Assocs.,*
180 B.R. 629, 639 (D. Kan. 1995)....................................................................... 12, 15, 17

*In re Kopel,*
232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999)......................................................................... 23

*In re Lunan Family Rests.,*
194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) ....................................................................... 10

*In re Moreggia & Sons,*
852 F.2d 1179, 1182 (9th Cir. 1988) ............................................................................... 10

iii

*In re Opelika Mfg. Corp.,*
    67 B.R. 169, 171 (Bankr. N.D. Ill. 1986) ...................................................................... 9, 15

*In re PCH Assocs.,*
    804 F.2d 193, 200-01 (2d Cir. 1986) ........................................................................ 10, 13

*In re Plitt Amusement Co.,*
    233 B.R. 837, 845-46 (Bankr. C.D. Cal. 1999) .............................................................. 18

*In re Resource Tech. Corp.,*
    254 B.R. 215, 225-26 (Bankr. N.D. Ill. 2000) ................................................................ 9

*In re Sanshoe,*
    139 B.R. 585, 597 (S.D.N.Y. 1992) ............................................................................... 23

*In re U.L. Radio Corp.,*
    19 B.R. 537 (Bankr. S.D.N.Y. 1982) .............................................................................. 23

*In re Wheatfield Bus. Park,*
    308 B.R. 463, 466 (9th Cir. 2004) .................................................................................. 22

*In re Wheeling-Pittsburgh Steel,*
    54 B.R. 772, 779 (Bankr. W.D. Penn. 1985) ................................................................. 23

*In re Wingspread Corp.,*
    116 B.R. 915, 923 (Bankr. S.D.N.Y. 1990) ................................................................... 17

*In re Winston Mills,*
    6 B.R. 578, 598 (Bankr. S.D.N.Y. 1980) ....................................................................... 13

*John v. United Adver., Inc.,*
    439 P.2d 53, 56 (Colo. 1968) .......................................................................................... 21

*Lulich v. Sherwin-Williams Co.,*
    992 F.2d 719, 721 (7th Cir. 1993) .................................................................................... 1

*North Avenue Prop., L.L.C. v. Zoning Bd. of Appeals,*
    726 N.E. 2d 65, 71 (Ill. App. Ct. 2000) ........................................................................... 9

*Schwartzman v. Weiner,*
    319 A.2d 48, 52 (Del. Super. Ct. 1974) ......................................................................... 13

**Statutes**

28 U.S.C. § 158(a)(1) ................................................................................................... 1

**Other Authorities**

BLACK'S LAW DICTIONARY 94 (7th ed. 1999) .............................................................. 1

S. Rep. No. 989, 95th Cong., 2d Sess. 64 ............................................................. 10, 18

**A.     STATEMENT OF THE BASIS OF APPELLATE JURISDICTION**

The summary judgment order of the Bankruptcy Court for the Northern District of Illinois ("Bankruptcy Court") was docketed on March 30, 2004. Appellant, United Air Lines, Inc. ("United") filed a timely notice of appeal on April 8, 2004. The notice of appeal was docketed with the District Court on or about April 21, 2004. The District Court has appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

**B.     STATEMENT OF THE ISSUES PRESENTED**

The issues on appeal are: 1) whether the Financing Portions of the Special Facilities and Ground Lease entered into by United and the City and County of Denver (collectively, the "City") constitute a financing arrangement as opposed to a "true lease" subject to Bankruptcy Code Section 365; and 2) whether the Financing Portions of the Special Facilities and Ground Lease are severable from, and independent of, the Lease Portions of the Special Facilities and Ground Lease.

**C.     STANDARD OF REVIEW**

The dispositions of cross-motions for summary judgment are reviewed *de novo*, "with all facts and inferences therefrom viewed in a light most favorable to each nonmoving party." *Hoseman v. Weinschneider*, 322 F.3d 468, 473 (7th Cir. 2003); *see also Carston v. The County of Cook*, 962 F.2d 749, 751 (7th Cir. 1992). Appeal *de novo* is defined as "[a]n appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." BLACK'S LAW DICTIONARY 94 (7th ed. 1999). Therefore, these issues on appeal should be decided without deference to the ruling from the Bankruptcy Court below. *See Lulich v. Sherwin-Williams Co.*, 992 F.2d 719, 721 (7th Cir. 1993) (under this standard, the appellate court is not bound by the bankruptcy court's legal conclusions but instead examines the law "anew.")

**D.** **STATEMENT OF THE CASE**

This is an appeal by United, the plaintiff below, from a summary judgment ruling by the Bankruptcy Court in favor of the defendants, the City and HSBC Bank USA ("HSBC" or "Paying Agent"), and against United in an adversary proceeding stemming from United's Chapter 11 bankruptcy case.

(1) Background of United's Bankruptcy

On December 9, 2002 (the "Petition Date"), the Debtors,[1] including United, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and commenced Chapter 11 cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. On December 13, 2002, the United States Trustee appointed an official committee of unsecured creditors.

The Debtors currently operate the world's second largest airline and provide air transportation, cargo, and other transportation-related services to millions of customers each year.

On September 19, 2003, the Bankruptcy Court entered an order extending the Exclusivity Periods for United to file and solicit acceptances for a Chapter 11 plan of reorganization through and including, March 8 and May 7, 2004, respectively. At the April 16, 2004, omnibus hearing, the Bankruptcy Court extended the Exclusivity Period to June 30, 2004. On June 4, 2004, United moved to extend the Exclusivity Period to September 30, 2004.

---

[1]   The Debtors consist of UAL Corporation ("UAL"), a Delaware corporation with its principal place of business in Elk Grove Village, Illinois, and twenty-seven wholly-owned, direct or indirect subsidiaries. UAL's principal subsidiary, United, operates the airline and related businesses, and UAL's other Debtor-subsidiaries hold assets or perform activities related to the airline.

(2)    Background of United's Municipal Bond Adversaries[2]

On March 21, 2003, United filed adversary complaints against four different airports (Los Angeles International Airport ("LAX"), San Francisco International Airport ("SFO"), John F. Kennedy Airport ("JFK"), and Denver International Airport ("Denver" or "Denver Airport")), the issuers of certain special facility bonds (to the extent such bonds were not issued by the operator of the airport), and the trustees of those bonds, seeking a declaratory judgment by the Bankruptcy Court that: 1) certain agreements labeled as "leases" were not "true leases" under the bankruptcy law, but instead were financing arrangements; and 2) the financing arrangements were not integrated with, or were separate and distinct from, the true leases governing United's use and occupancy of the facilities located at each of those airports.[3]  Shortly thereafter, United moved for summary judgment on those same issues. *See* United's SJ Memo and Motion (Docket Nos. 38 and 40).  The Bankruptcy Court allowed a fact discovery period before the defendants were required to respond to the summary judgment motions.

On or about August 22, 2003, the defendants filed a response brief to United's motion for summary judgment as well as cross-motions for summary judgment. *See* Defendants' Cross-Motion and Memorandum for Summary Judgment and Defendant's Response to Summary

---

[2]    United will only cite herein to the designated record, which includes pleadings, orders, and transcripts from the Denver adversary proceeding, 03A00978, as well as designations for the other related adversaries mentioned below to the extent that the pleadings in each of the four adversaries were filed together, the hearings for each of those adversaries were heard together, or the Bankruptcy Court ruled on each of those adversaries together. Those designations include: United's Memorandum in Support of Its Motion for Summary Judgment ("United's SJ Memo") (Docket 40); the 3/27/03 hearing on United's motions for a temporary restraining order; the 10/24/03 hearing on each of the parties summary judgment motions; and the Bankruptcy Court's Memorandum Opinion on the Summary Judgment Motions ("Court's SJ Opinion") (Docket No. 110). For a full description of each of the adversaries, *see* United's SJ Memo (Docket No. 40), and the Court's SJ Opinion (Docket No. 110).

[3]    Although a complaint was originally filed against the Denver defendants on March 21, 2003, an amended complaint was filed on April 4, 2003, to correctly identify the defending parties to the suit. *See* Denver Am. Complaint (Adversary Proceeding No. 03A00978) ("Complaint") (Docket No. 25).

Judgment and Cross Motion for Summary Judgment ("Defendant's SJ Response") (Docket Nos. 58 and 60). United replied to its summary judgment briefs and responded to the cross-motions for summary judgment on September 5, 2003. *See* United's Reply Memorandum in Support of Its Motion for Summary Judgment and Opposition to Cross Motions for Summary Judgment ("United's SJ Reply") (Docket No. 69). The defendants then filed a reply to their cross-motions for summary judgment on September 12, 2003. *See* Defendants' Reply Brief in Further Support of Their Cross Motion for Summary Judgment and in Opposition to United's Motion for Summary Judgment (Docket No. 90). A summary judgment hearing for each of the four adversaries was held on October 24, 2003. *See* 10/24/03 Hearing Transcript, at 43-96. On March 30, 2004, the Bankruptcy Court ruled on each of the summary judgment matters, finding in favor of United and against defendants in the LAX, SFO, and JFK proceedings, and against United and for the Denver defendants. *See* Court's SJ Opinion and Order (Docket Nos. 110 and 111).

United timely filed a notice of appeal against the Denver defendants (the "Defendants") on April 8, 2004, and a statement of issues and designations on April 19, 2004. The SFO and JFK defendants also appealed. Each of these appeals were transmitted to this Court on or about April 21, 2004. Upon a joint motion of the parties to each appeal, this Court entered a scheduling order providing that appellant briefs are due on June 10, 2004, appellee briefs on July 1, 2004, and reply briefs on July 15, 2004. The Court also set a status hearing for August 25, 2004.

Shortly thereafter, the LAX defendants filed their notices of appeal. The LAX appeals were transmitted to this Court on May 12, 2004, and the Court entered the same briefing and status hearing schedule that it had entered for the Denver, SFO, and JFK appeals.

4

(3)     Factual Background for the Denver Adversary Proceeding

United appeals from the Bankruptcy Court's interpretation of the Special Facilities and Ground Lease. All parties moved for summary judgment, in explicit agreement that no genuine issue of material fact exists. *See* Defendants' SJ Response at 3 (Docket No. 60).

(a)     *Structure of the Denver Transaction*

In October 1992, the City issued special facilities revenue bonds (the "Bonds") in the amount of $261,415,000 pursuant to, among other agreements, a Special Facilities and Ground Lease dated October 1, 1992, between the City and United.[4] *See* Complaint at Ex. 1, Special Facilities and Ground Lease ("SF&GL") (Docket No. 25). United applied the proceeds from the sale of the Bonds to construct facilities at the Denver Airport ("Denver Airport Projects"). The Bonds are special, limited obligations of the City, payable solely from the so-called "Facilities Rentals" that United pays to the Paying Agent pursuant to the Special Facilities and Ground Lease. *See* Complaint at Ex. 2, Ordinance No. 712, §§ 1.11 and 3.1 (Docket No. 25).

The Bonds are not secured by the separate "Ground Rentals" that United pays the City pursuant to the Special Facilities and Ground Lease, or by a mortgage or other lien on the Denver Airport Projects or any other property owned by United or the City. *See* Complaint at Ex. 1, SF&GL § 6.1(a) (Docket No. 25). Once the Bonds have been fully repaid, title to the facilities

---

[4]     The other agreements include: (i) Ordinance No. 626, Series of 1984 adopted by the Denver city council on November 26, 1984 (*see* United's SJ Reply at Ex. 16, Ordinance No. 626 (Docket No. 69)); (ii) Ordinance No. 712, Series of 1992 adopted by the Denver city council on October 13, 1992 (*see* Complaint at Ex. 2, Ordinance No. 712 (Docket No. 25)); (iii) the Guaranty Agreement dated as of October 1, 1992, between United and HSBC Bank USA, as paying agent (*see* Complaint at Ex. 3, Guaranty (Docket No. 25)); and (iv) the Bond Purchase Agreement dated as of October 1, 1992, between United, Lehman Brothers, on its own behalf and on behalf of Merrill Lynch & Co. and Pryor McClendon, Counts & Co, Inc., (*see* Complaint at Ex. 4, Bond Purchase Agreement (Docket No. 25)).

reverts to the City to form a part of the "Airport Facilities" on a going-forward basis. *See* Complaint at Ex. 1, SF&GL § 4.3 (Docket No. 25).

The Special Facilities and Ground Lease serves two functions: (1) it provides for the lease by the City to United for a specific area of ground and certain facilities at the Denver Airport (the "Lease Portions"); and (2) it sets forth the terms of United's financing of the Denver Airport Projects (the "Financing Portions"). United makes separate payments with respect to each portion, including payment to the City of "Ground Rentals" for the Lease Portions and payment directly to the Paying Agent of "Facilities Rentals" for the Financing Portions, which equals the debt service on the Bonds. *See* Complaint at Ex. 1, SF&GL § 6.1 (Docket No. 25).

(b)    *Power to Issue the Bonds*

Ordinance No. 626 (also known as the "General Airport Bond Ordinance"), together with Ordinance No. 712, granted the City the authority to issue bonds to develop Denver Airport. Ordinance No. 712 empowered the City to issue special facilities bonds to finance the improvements to the facilities. *See* Complaint at Ex. 2, Ordinance 712, Recitals (4) and (8) (Docket No. 25); United's SJ Reply at Ex. 16, Ordinance 626, § 801 (Docket No. 69).

The General Airport Bond Ordinance obligates the parties to arrange for a separate financing agreement independent of the lease. Specifically, Ordinance No. 626 requires that, when financing is needed, a "Net Rent Lease" should be entered into for the "Special Facilities," and a "*second* Net Rent Lease" should be entered for the leasing of the premises. *See* United's SJ Reply at Ex. 16, Ordinance 626, §§ 803, 804 (emphasis added) (Docket No. 69). Nevertheless, the City opted to draft the two agreements on the same piece of paper.

6

(c)    *Additional Facts Learned During Discovery*

Looking beyond the contracts and ordinances at issue, the facts learned through discovery further elucidate the dual role of the Special Facilities and Ground Lease. For example, Richard DeRemer, a United attorney involved in negotiating the Special Facilities and Ground Lease, stated in his deposition that the Financing Portions and the Lease Portions were drafted by completely separate teams of individuals and then "shuffled together like a pack of cards." United's SJ Reply at Ex. 18, DeRemer Dep., 52:21-53:7 (Docket No. 69).

Defendants' own expert, Stephen Martin, conceded that the financing arrangement and the true lease used at Denver are really no different from the financing arrangements and true leases entered at the other airports: "[t]he framework for developing [Denver Airport] is similar to that seen at most U.S. airports and methods for establishing rates, fees, and charges at [Denver Airport] reflect the cost-based approach seen at those airports." *See* United's SJ Reply at Ex. 20, Martin Expert Report, 6-7 (Docket No. 69). Martin admits that United paid "Facilities Rentals" to "provide for the full repayment of all costs related to the improvements financed by the City with the 1992A Bonds" which payment consisted of principal and interest on the Bonds. *Id.* at Ex. 20, Martin Expert Report, ¶ 30 (Docket No. 69). Defendants' expert further confirmed that the "Facilities Rentals" "are designed to match both the amount and the timing of the payments on the bonds." *Id.* at Ex. 20, Martin Dep., 84:10-14 (Docket No. 69); *see also id.* at 81:13-23 ("Q: Is it your further understanding that the facilities rentals . . . were set so that they would be sufficient to pay the principal, any premium, and the interest on the special facilities revenue bonds?" A: "Oh yes."); *id.* at 82:17-19 ("I believe the facilities rental component provides for the source of revenue for repayment of the debt.").

In  addition, a letter from the financial advisor to the City, Lazard Freres & Co., to the Director of Aviation states: "[i]ncluded is a *financing* for the benefit of United Airlines for $160

million to *finance* support facilities at the New Airport." United's SJ Reply at Ex. 17, DIA 00372 (emphasis added) (Docket No. 69). No one, not even the City's financial advisors, can dispute that United was seeking financing. The facts learned during discovery confirm that the parties intended to enter into two separate agreements which were improperly placed in one document, apparently for administrative convenience.

### E.    SUMMARY OF ARGUMENT

While the Bankruptcy Court correctly analyzed the LAX, SFO, and JFK Bond Agreements to determine their economic substance,[5] it did not apply that same analysis to the Financing Portions of the Special Facilities and Ground Lease in Denver. Rather, the Bankruptcy Court dealt only with the issue of whether the Special Facilities and Ground Lease is severable. *See* Court's SJ Opinion and Order, at 26-28 (Docket Nos. 110 and 111). However, a proper application of the law of contract severability reveals that the Special Facilities and Ground Lease is in substance two separate agreements with two completely different purposes that were simply drafted on the same piece of paper out of convenience. An application of the "economic substance" factors to the Financing Portions of the Special Facilities and Ground Lease confirms that the Financing Portions are substantively no different than the financing arrangements at LAX, SFO, and JFK.

### F.    ARGUMENT

(1)    The Financing Portions of the Special Facilities and Ground Lease are not a True Lease.

To determine whether an instrument is a "true lease," the Court should look beyond the form and title of a transaction and focus on its economic reality. *See, e.g., In re Resource Tech.*

---

[5] Court's SJ Opinion at 19-26 (Docket No. 110).

8

*Corp.*, 254 B.R. 215, 225-26 (Bankr. N.D. Ill. 2000) (holding that because the "essence" of the agreement was "the collection and processing of the gas" and "not possession and use of any . . . property," the agreement was not a lease);[6] *In re Opelika Mfg. Corp.*, 67 B.R. 169, 171 (Bankr. N.D. Ill. 1986). This determination is essential to properly and fairly compensate a debtor's creditors on equal ground. Where "security transactions, loans, and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the 'lessor' gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate." *In re Hotel Syracuse, Inc.*, 155 B.R. 824, 841 (Bankr. N.D.N.Y. 1993).

The legislative history of the Bankruptcy Code supports this approach, and explicitly states that the rules governing leases (including the applicability of Section 365(d)(3)) are not intended to apply to financing arrangements:

> As used in section 502(b)(7), the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security. . . . In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The "lessors" are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law. . . . Whether a "lease" is [a] true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. ***The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease."***

---

6    The Bankruptcy Court also cited *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, for the proposition that "[a] lease is a definite agreement as to the extent and bounds of the property demised and transfers exclusive possession thereof to the lessee." *In re Resource Tech. Corp*, 254 B.R. at 226 (*quoting North Avenue Prop., L.L.C. v. Zoning Bd. of Appeals*, 726 N.E. 2d 65, 71 (Ill. App. Ct. 2000)). As stated in the text, there is no property that is leased under the Facilities Portions. Furthermore, the City does not transfer "exclusive possession" of the ground to United in conjunction with United's payments on the Bonds.

S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787, 5850 (emphasis added); *see also In re Lunan Family Rests.*, 194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) (relying on this legislative history in analyzing what constitutes a lease under Section 365); *In re Moreggia & Sons*, 852 F.2d 1179, 1182 (9th Cir. 1988) (same).

Courts primarily consider the following factors when assessing the economic substance of an agreement: (1) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment; (2) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction; (3) whether the property was purchased by the lessor specifically for the lessee's use; (4) whether the transaction was structured as a lease to secure certain tax advantages; and (5) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance. *See In re PCH Associates*, 804 F.2d 193, 200-01 (2d Cir. 1986). Courts also consider lease provisions which permit or require the lessee to reacquire its interest in the premises for a nominal sum at the end of the lease term. *See In re Hotel Syracuse, Inc.*, 155 B.R. at 838-39. These factors serve as guideposts to assess the economic reality of a transaction.

> (a) *The "Facilities Rentals" Were Purposefully Tailored to Repay the Bonds, and Not To Compensate for Use and Occupancy of the Denver Airport.*

The first, and most significant, factor in the economic substance analysis is the underlying purpose of the "lease" at issue. The Bankruptcy Court identified this factor as the single most important factor in the "economic substance" analysis. *See* 10/24/03 Hearing Transcript, p. 50. It is particularly important then, that the "Facilities Rentals" payable by United

10

are not tied to use and occupancy of any space at the Denver Airport, but instead, precisely equal the debt service payable on the Bonds.

The true rent United pays pursuant to the Lease Portions of the Special Facilities and Ground Lease is separate and distinct from the debt service that United pays pursuant to the Financing Portions. Specifically, United pays the City "Ground Rentals" for its use and occupancy of the facilities pursuant to the Lease Portions. *See* Complaint at Ex. 1, SF&GL § 6.2(a) (Docket No. 25). Section 6.2(a) of the Special Facilities and Ground Lease requires United to pay a fixed amount per square foot plus common area expenses on a monthly basis in advance as rent for use and occupancy of the Denver Airport. *See id.* As is common with true rent, the "Ground Rentals" are based on the square footage of occupied space. *See id.*

On the other hand, Section 6.1(a) of the Financing Portions requires United to pay to the Paying Agent, *not* the City, an amount precisely equal to the principal, premium (if any), or interest on the Bonds on a semi-annual basis. *See* Complaint at Ex. 1, SF&GL § 6.1(a) (Docket No. 25). There is no evidence that the "Facilities Rentals" are calculated based on fair market value or bear any relation, other than financing, to the property United uses at the Denver Airport. *See id.* Furthermore, as is common in financing transactions and as is true with United's seventeen other bond issues, the "Facilities Rentals" are payable semi-annually in arrears, corresponding to the payment dates on the Bonds. *See id.* at § 6.1(a) and Ex. 2, 712 Ordinance, Ex. A (Docket No. 25).

Any argument that the "Facilities Rentals" constitute compensation for the use and occupancy of airport facilities flies in the face of reason. The Defendants' own expert has conceded that the "Facilities Rentals" "are designed to match both the amount and the timing of the payments on the bonds." United's SJ Reply at Ex. 25, Martin Dep., 84:10-14 (Docket No.

11

69); *see also id.* at 81:13-23 ("Q: Is it your further understanding that the facilities rentals . . . were set so that they would be sufficient to pay the principal, any premium, and the interest on the special facilities revenue bonds?" A: "Oh yes."); *id.* at 82:17-19 ("I believe the facilities rental component provides for the source of revenue for repayment of the debt."). Accordingly, even the Defendants cannot deny that the Lease Portions provide for true rent of the facilities at the Denver Airport, while the Financing Portions provide for repayment of the Bonds.

> (b)     *The "Facilities Rentals" Are Directly Related to the Amount Financed for Construction, Not the Property's Fair Market Value.*

The second factor of the economic substance analysis turns on whether the "purchase price" was related to the fair market value of the land, or instead was calculated as the amount necessary to finance the transaction. *See In re Hotel Syracuse*, 155 B.R. at 838-39; *In re KAR Dev. Assocs.*, 180 B.R. at 639. Because title to the property never passes through United in the present context and hence, there is no so c-called "purchase price." Therefore, the relevant analysis in this case is whether the Bond proceeds related to the amount necessary to finance the transaction or the fair market value of the facilities.

Neither United nor Defendants preformed an analysis of the fair market value of the facilities to be constructed with the Bond proceeds. The Defendants did not put forth any evidence to suggest that any party analyzed, or even considered, the fair market value of the facilities constructed with the Bond proceeds. Thus, to the extent the Bond proceeds happened to coincide with the fair market value of the facilities, this is mere fortuity. The Bond proceeds reflect exactly the cost of constructing the improvements at Denver Airport plus administrative and ancillary fees and other expenses not relevant to this analysis, and not the fair market value.

12

> (c) *The Improvements Financed by the Bonds Were Specifically Purchased For United's Use.*

The third factor of the economic substance analysis asks whether the "property [was] purchased by the lessor specifically for the lessee's use." *In re PCH Assoc.*, 804 F.2d at 200-01 (*quoting In re Winston Mills*, 6 B.R. 587, 598 (Bankr. S.D.N.Y. 1980)). This factor also weighs in United's favor. The Denver Airport Projects were specifically undertaken for United's use and benefit. *See* Complaint at Ex. 1, SF&GL at 1 ("the Company desires to construct and equip certain facilities . . . the City proposes to assist the Company in undertaking such improvements by financing a portion of the costs") (Docket No. 25). As the Defendants have acknowledged, United enjoys the current benefit of the exclusive use of the facilities. *See* Defendant's SJ Response at 32 (Docket No. 60); *see also* Complaint at Ex. 1, SF&GL §3.2(a) (Docket No. 25). These facilities, and the bond debt incurred to build them, were specifically tailored and executed for United's use.

Under a typical "true lease," any improvements to a property would ultimately be for the lessor's – rather than the lessee's – benefit. *See, e.g., Schwartzman v. Weiner*, 319 A.2d 48, 52 (Del. Super. Ct. 1974); *In re Hotel Syracuse*, 155 B.R. at 839 (financing arrangement found where the hotel premises were acquired by a public industrial development agency to benefit the debtor by providing low cost financing for refurbishment and expansion of the original hotel, notwithstanding the fact that the agency acted in furtherance of its statutory purpose of promoting job opportunities and economic development in Syracuse). All of the evidence confirms that the facilities were constructed specifically for United's exclusive use. The City merely took title to the improvements to facilitate the issuance of tax-exempt bonds, thus providing United with low-cost financing of such improvements. As such, the third factor of the economic substance test also demonstrates that the Financing Portions are not a true lease.

13

> (d)     The Financing Portions Were Stylized as a Lease to Gain a Tax
>         Advantage.

The fourth factor asks whether the transaction was structured as a lease to secure certain tax advantages. United's stated objective when the Denver Airport was constructed was to "reduce the total costs incurred by United and others in constructing and equipping the new Denver Airport." United's SJ Reply at Ex. 27, 6/14/92 letter from United to City, UA MUNI 0002218 (Docket No. 69). Therefore, United considered the use of General Airport Revenue Bonds ("GARBs") and Special Facility Revenue Bonds in financing the facilities, and conducted an analysis of United's ability to use the City's state sales tax exemption. See United's SJ Reply at Ex. 28, Open Issues Memo., UA MUNI 0002225 (Docket No. 69). Consistent with this evidence, the financial advisor to the City, Lazard Freres & Co., explained that GARBs may not be available, but offered United an analysis of the other "financial advantages" of using Special Facility Revenue Bonds. See id. at Ex. 17, DIA 00372-73 (Docket No. 69). United's 30(b)(6) representative and Treasurer, Jeff Kawalsky, further confirmed that United used Special Facility Revenue Bonds to secure tax-exempt financing. See id. at Ex. 29, Kawalsky Dep. (Denver), 38:23-39:2 ("The purpose of the Special Facilities Lease was to provide a mechanic to facilitate the raising of -- to facilitate a borrowing by United, a tax-exempt borrowing by United.") (Docket No. 69).

Special facility bond financings have been regularly structured as "leases" as a means to avoid certain constitutional debt limitations, or similar constitutional or statutory limitations, while still retaining tax-exempt status. See United's SJ Memo at Ex. C, Stewart E. Sterk & Elizabeth S. Goldman, Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations, 1991 Wis. L. Rev. 1301, 1330-33 (1991) (Docket No. 40). Such debt limitations have ranged from limitations on the amount of permitted public debt to

14

outright bans on public debt for private projects. *See id.* at 1305, n.15. As special facility bond financings are backed solely by revenues from the project, instead of public tax dollars, the public authority is able to argue that the borrowing does not constitute "debt" of the public authority. As such, the public authority is able to offer access to low-cost financing, inherent with tax-exempt special facility revenue bonds, while escaping constitutional debt limitations. *See* United's SJ Memo at Ex. D; James Gadsden, *Recharacterization of Industrial Development Bond Real Property Leases in Bankruptcy Cases*, 113 Banking L. J. 466, 470 (1996) (noting that the structure of industrial development bonds, which are structured similarly to special facility revenue bonds, "reflects no more than the historical antecedents in qualifying for the tax exemptions available to municipalities.") (Docket No. 40). Simply put, United went out of its way to secure tax-exempt financing, and there is no evidence to the contrary.

### (e) United Has Taken On Many Obligations Typical of a Lessor.

The fifth and final factor contemplates whether the lessee assumed many of the obligations normally associated with outright ownership. Generally speaking, a true lessee would not take on many of the burdens typically borne by the landlord. These burdens include paying construction cost overruns, assuming liability for construction contracts, paying taxes, making all repairs and maintenance (including structural repair and maintenance), providing insurance, and having the sole right to alter the facility and make improvements on the land. *See In re Kar Dev. Assocs.*, 180 B.R. at 639; *see also In re Opelika Mfg. Corp*, 67 B.R. at 171-72 (applying Georgia law) (determining that allowing the lessee to make modifications at its own discretion weighed in favor of the lease being construed as a financing arrangement). However, in a financing transaction the lessee performs many of the functions typically reserved to the owner or lessor of the property. Here, United has taken on many of the burdens that are

15

generally borne by the lessor, further supporting that the agreements at issue are really disguised financing arrangements rather than true leases.

Under the Special Facilities and Ground Lease, United, not the lessor, pays taxes, maintenance, insurance, and the like, as well as all of Denver's bond-related administrative expenses. *See* Complaint at Ex. 1, SF&GL §§ 6.1, 6.3, 7.5, 8.10, 9.1 and 9.2 (Docket No. 25). United must maintain casualty insurance on the facilities, another function that true lessors typically assume and control (though its cost is often passed through to a lessee). *See id.* at § 9.1. The Special Facilities and Ground Lease also contains stringent "hell or high water" provisions associated with the "Facilities Rentals." For example, even if all of the facilities were taken by eminent domain such that United was completely ousted of possession, United would remain obligated to continue to pay, or prepay, the "Facilities Rentals". *See id.* at §§ 6.4 and 9.4. However, in such case, the Ground Rentals would abate altogether. *See id.* at § 9.11(d).

United is also charged with the task of contracting for and causing the construction of the improvements, and must indemnify the City against certain claims made with respect to the construction, despite the City taking nominal title to the improvements. *See* Complaint at Ex. 1, SF&GL §§ 5.1, 5.2, and 7.4 (Docket No. 25). A typical lessor in a so-called "build-to-suit-to-lease" project would take full ownership and control of the process of construction -- not simply stand by and let its lessee construct its improvements and take title to whatever the lessee constructs.

Further, United has the obligation to fund any shortfalls in the event that the Bonds are insufficient to cover the cost of the construction. *See id.* at § 5.6. A "true" lessee would typically not assume liability for cost overruns or insufficient financing proceeds. These risks

16

and responsibilities undertaken by United indicate that the Financing Portions of the Special Facilities and Ground Lease are, in fact, disguised financing provisions.

      (f)    *United Will Retain Its Leasehold Interest Upon Satisfaction of the Bonds.*

Courts have also considered lease provisions that permit or require the lessee to reacquire its interest in the premises for a nominal sum at the end of the lease term. *See, e.g., In re Hotel Syracuse, Inc,* 155 B.R. at 838-39; *In re KAR Dev. Assocs.,* 180 B.R. 629 at 639; *In re Wingspread Corp.,* 116 B.R. 915, 923 (Bankr. S.D.N.Y. 1990). Though these cases all involved a so-called "bargain purchase option," the reasoning advanced is that the borrower has the right to get back the same interest it had prior to the financing transaction, be it fee simple title, a leasehold, or some other interest. Many of the relevant reported decisions addressing issues of the recharacterization, as discussed herein, stem from an in-depth analysis of industrial revenue bonds. The industrial revenue bonds borrower typically owns the unimproved property prior to the financing and, upon the satisfaction of the financing, the borrower typically has the right to take back title to the improved property. Though industrial revenue bonds and airport special facility revenue bonds have many similarities, in the latter case the borrower typically does not hold title to the unimproved airport property prior to the financing. Rather, the borrower in airport special facility revenue bonds typically holds only a leasehold interest. So once the financing has been repaid, the borrower would not "take back" title it never held, but rather would have the right to take back a leasehold interest.

In this case, United held an expectation of a leasehold interest in and to the underlying airport property prior to the issuance of the Bonds. As a logical result, United does not have the right to purchase the improved airport facility merely as a consequence of the financing. Instead, United's interest, if any, is an expectation of a leasehold interest -- the same as that immediately prior to the financing.

17

The drafters of Section 365 of the Bankruptcy Code stated that financing leases, which are not "true" leases for purposes of bankruptcy, "are in substance installment sales *or loans*. . . . The 'lessors' are essentially sellers *or lenders* and should be treated as such for purposes of bankruptcy law." S. Rep. 95-989, 1978 U.S.C.C.A.N. 5787 (emphasis added). The drafters further stated that, where there is a financing lease, "[t]he rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property." *Id.* The fact that the "Facilities Rentals" are payments of principal and interest indicates a financing lease under the legislative history and gives further support to United's position. Where the *raison d'etre* is expressly to enable a financing, a finding that the resulting lease is not a "true lease" for purposes of Section 365(d)(3) of the Bankruptcy Code is required. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 64, 1978 U.S.C.C.A.N. 5787, 5850.

(2)     The Financing Portions are Severable from the Lease Portions of the Agreement

Once it is determined that the Financing Portions of the Special Facilities and Ground Lease are, in substance, a financing arrangement, the Court must determine if those portions are severable from the Lease Portions. Application of the law to the facts in this case confirm that Financing Portions have a completely separate function than the Lease Portions and should be severed from the contract.

(a)     *Colorado Law Looks to the Intent of the Parties to Determine Whether a Contract is Severable.*

While the issue of whether an agreement is a true lease for purposes of Section 365 of the Bankruptcy Code is a matter of federal bankruptcy law, the issue of whether one or more agreements are severable is a matter of state law. *See In re Plitt Amusement Co.*, 233 B.R. 837, 845-46 (Bankr. C.D. Cal. 1999) (finding that, while no federal case has specifically held that

18

state law governs the issue of whether multiple obligations in a transaction are severable, the cases that have applied state law to the severability issue have done so incidentally to their holdings); *In re GP Express Airlines, Inc.*, 200 B.R. 222, 227 (Bankr. D. Neb. 1996) (holding that state law applied to the determination that each of the three leases signed by the debtor were independent obligations of the parties to the leases). United and the Defendants agree that the test for severability under Colorado law is "whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever if any promise or set of promises were struck out." *Brooks v. United Airlines*, Nos. 92CA1657, 92 CA1723, 1994 WL 872958, at *3 (Colo. Ct. App. 1994); *Homier v. Faricy Truck & Equip. Co.*, 784 P.2d 798, 801 (Colo. Ct. App. 1988) ("In Colorado, for a contract to be severable, the language of the contract must evince the parties' intention to have assented separately to successive divisions of the contract, upon performance of which the other party would be bound."); *see also* Defendant's SJ Response at 19 (Docket No. 60). Applying Colorado law, the Financing Portions of the Special Facilities and Ground Lease are severable.

The General Airport Bond Ordinance, together with Ordinance No. 712, grant the City the authority to issue special facility revenue bonds.[7] Ordinance No. 626 requires that, when a

---

[7]    The first paragraph of Ordinance No. 626 states the purpose of the Ordinance:

> AN ORDINANCE DESIGNATED AS THE "1984 SYSTEM GENERAL BOND ORDINANCE;" CONCERNING THE AIRPORT FACILITIES OF THE CITY AND COUNTY OF DENVER; ESTABLISHING GENERAL PROVISIONS RELATING TO AIRPORT SYSTEM REVENUE BONDS; PROVIDING THE FORMS, TERMS, AND CONDITIONS OF THE BONDS, THE MANNER AND TERMS OF THEIR ISSUANCE, THE MANNER OF THEIR EXECUTION, THE METHOD OF THEIR PAYMENT, AND THE SECURITY THEREFOR; PROVIDING FOR THE COLLECTION AND DISPOSITION OF REVENUES DERIVED FROM THE OPERATION OF SUCH AIRPORT FACILITIES; PLEDGING SUCH REVENUES TO THE PAYMENT OF THE BONDS; PROVIDING VARIOUS COVENANTS, AGREEMENTS, AND OTHER DETAILS, AND MAKING OTHER

(Continued...)

19

financing is needed, a "Net Rent Lease" should be entered into for the "Special Facilities,"[8] and a "*second* Net Rent Lease" should be entered for the Ground Lease.[9] *See* United's SJ Reply at Ex. 16, Ordinance 626, §§ 803, 804 (Docket No. 69). Ordinance No. 626, which allowed for the financing of improvements and leasing of premises at the Denver Airport, shows that the Financing Portions and the Lease Portions were not only intended, but *mandated*, as a matter of law, to be two separate agreements. The City merely opted to draft the two separate contracts on a single piece of paper. The only way to reconcile Ordinance 626 and the Special Facilities and Ground Lease is to hold the agreement to be divisible as required by Colorado law.

---

> PROVISIONS CONCERNING AIRPORT FACILITIES, THE BONDS, REFUNDING AND IMPROVEMENT PROJECTS, AND AIRPORT FACILITIES REVENUES; RATIFYING ACTION PREVIOUSLY TAKEN AND RELATING TO THE FOREGOING MATTERS; PROVIDING OTHER MATTERS RELATING THERETO; DECLARING AN EMERGENCY; AND PROVIDING THE EFFECTIVE DATE HEREOF.

[8] "Special Facilities" are defined in Ordinance No. 626 as: "facilities relating or used in connection with the Airport System, the cost of which is financed with the proceeds of Special Facilities Bonds issued pursuant to Art. VIII hereof." United's SJ Reply at Ex. 16, Ordinance No. 626, Art. I.A.(77) (Docket No. 69).

[9] Specifically, Ordinance No. 626 states:

> Section 803. Facilities Lease. A Net Rent Lease of any Special Facilities shall be entered into between the parties to such contract pursuant to which the lessee agrees to pay to the City rentals in periodic installments in each year during the term thereof which shall be sufficient to pay the principal of, interest on and any redemption premiums due in connection with the Special Facilities Bonds to be issued by the City pursuant to this article to pay the cost of acquiring, improving, or equipping such Special Facilities. The term of any Net Rent Lease shall not exceed the term of the Special Facilities Bonds issued in connection with that Net Rent Lease.

> Section 804. Ground Lease. A second Net Rent Lease for the same term as that provided in the lease entered into between the parties to such contract providing for additional rentals for the ground upon which such facilities are located, which lease shall provide for rental payments to the City payable in periodic installments. Such ground rentals shall be firm for the term of the lease entered into under § 803 hereof, but the lease may include provisions for increasing or decreasing such ground rentals during the lease term. All such ground rentals shall be payable into the Revenue Fund.

*(b)    To Determine Intent, Colorado Courts Also Consider Whether the
Consideration is Allocable.*

As part of the severability analysis, Colorado courts also give substantial weight to
whether the consideration paid is allocable. *See, e.g., John v. United Adver., Inc.*, 439 P.2d 53,
56 (Colo. 1968) (holding that singleness or apportionability of consideration is an important
factor to be considered in determining whether a contract is entire or severable).    The
consideration United pays under the Special Facilities and Ground Lease is allocable between the
debt service on the Bonds (the "Facilities Rentals") and the rental payments for the leased
premises (the "Ground Rentals").    Where, as here, a corresponding consideration supports each
covenant in the separate agreements, such structure indicates that the contract is severable.

On the one hand, Section 6.2(a) of the Special Facilities and Ground Lease provides that
United is to pay the City a fixed amount per square foot plus common area expenses on a
monthly basis.    On the other hand, Section 6.1(a) of the Financing Portions provides that United
shall pay "Facilities Rentals" to the Paying Agent, *not* the City, in an amount equal to the
principal, premium (if any), or interest on the Bonds. *See* Complaint at Ex. 1, SF&GL § 6.2(a)
and § 6.1(a) (Docket No. 25).    Additionally, Section 6.1(b) provides that, pursuant to Ordinance
No. 712, the City pledged the "Facilities Rentals" for payment of the Bonds. *See id.* at § 6.1(b).
The City made no such pledge of the "Ground Rentals" payable under Section 6.2(a), and
expressly stated as much in Section 6.1(b).

On examination of the structure of the payments under the Special Facilities and Ground
Lease, the allocation of consideration becomes obvious:

21

| Financing Portions | Lease Portions |
|---|---|
| Facilities Rentals are payable semi-annually to Paying Agent (§ 6.1(a)). | Ground Rentals are payable monthly to the City (§6.2(a)). |
| Facilities Rentals are payable in arrears to Paying Agent (§ 6.1(a)) | Ground Rentals are payable in advance to the City (§ 6.2(a)) |
| Facilities Rentals are equal to the principal, premium, and interest due on the Bonds (§ 6.1(a)) | Ground Rentals are based on a rate per square foot and the costs of common facilities (§ 6.2(a)) |
| Facilities Rentals commence immediately, regardless of beneficial occupancy (§6.1(a)) | Ground Rentals commence only upon the earlier of (i) commencement of operations, or (ii) the date of beneficial occupancy (§ 6.2(a)) |
| Facilities Rentals are subject to mandatory prepayment (§ 6.4(d) and (e)) | Ground Rental are not subject to mandatory prepayment |
| The default rate on the Facilities Rentals is based upon rates of the Bonds (§ 6.7) | The default rate on the Ground Rentals is based upon the applicable default rate in the Airport Use Agreement (§ 6.7) |

This specific allocation of consideration between the Lease Portions and Financing Portions of the Special Facilities and Ground Lease further illustrates the severable nature of the agreement.

> (c)  *A Holding that the Financing Portions Are Not Severable Would Be At Odds with Federal Law.* [10]

Colorado courts also refuse to enforce provisions that are illegal under federal law. *See, e.g., Fuller v. Pep Boys*, 88 F.Supp.2d 1158, 1162 (D. Colo. 2000) (fee-splitting provision

---

[10] This Court has the authority to hear this important legal issue on appeal. Both federal Bankruptcy Court and Seventh Circuit precedents hold that courts may consider purely legal issues for the first time on appeal, including issues of statutory interpretation and application. *See In re Country Lake Enter.*, 284 B.R. 223, 225 (Bankr. E.D.N.C. 2002) ("Because the statute speaks so directly to the issue before the court, the court elects to excuse the lack of timeliness and to address [debtor's] new argument."); *see also In re Wheatfield Bus. Park*, 308 B.R. 463, 466 (9th Cir. 2004) (bankruptcy appellate panel has discretion to consider issue raised for the first time on appeal if it is "purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed."); *Haroco, Inc. v. Am. Nat'l Bank & Trust*, 38 F.3d 1429, 1439 (7th Cir. 1994) ("So long as the new argument is a pure issue of statutory interpretation and the issue is fully argued in the briefs, we can decide the issue for the first time on appeal.") (internal citations and quotations omitted).

severed from contract because illegal under the Federal Arbitration Act.) By drafting the Financing Portions and Lease Portions into the same document, a failure by United to make payments under either the Financing Portions or Lease Portions would be a default under the entire Special Facilities and Ground Lease. *See* Complaint at Ex. 1, SF&GL, Art. 11.1(a) (Docket No. 25). Absent anything else integrating these agreements, this default is no different than a "cross-default" between two separate instruments. Enforcement of such a cross-default would violate Section 365(f)(1) of the Bankruptcy Code by hindering the debtor's ability to assume its lease.

Pursuant to Section 365(f) of the Bankruptcy Code, courts will refuse to enforce contract provisions that threaten the clear Congressional "policy favoring assumption and assignment of contracts." *In re E-Z Serve Convenience Stores*, 289 B.R. 45, 49 (Bankr. M.D.N.C. 2003). Courts have declined to enforce a wide variety of contract provisions that directly or indirectly restrict the assumption and assignment of executory contracts, including fees for assumption and assignment, provisions that restrict the use of the property, and cross-default provisions between two separate contracts. *See, e.g., In re Howe*, 78 B.R. 226, 231 (Bankr. S.D. 1987) (assumption fee on contract for deed); *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr. S.D.N.Y. 1982) (provision restricting use of leased premises); *In re Sanshoe*, 139 B.R. 585, 597 (S.D.N.Y. 1992) (cross-default provisions integrating separate contracts). Although many cases arise in the context of attempted assignment, Section 365(f) applies equally to restrictions on assumption. *See In re Kopel*, 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999) (in a case challenging a cross-default provision as a violation of Section 365, the court stated that Section 365 prohibited enforcement "even where the debtor seeks only to assume, rather than to assume and assign, a contract."); *In re Wheeling-Pittsburgh Steel*, 54 B.R. 772, 779 (Bankr. W.D. Penn. 1985) (cross-default

23

provision was unenforceable because it would "impermissibly restrict the Debtors' ability to assume some of the policies and reject others.").

The inherent "cross-default" provision in Article 11.1.(a) of the Special Facilities and Ground Lease hinders United's ability to assume its true lease. *See* Complaint at Ex. 1, SF&GL, Art. 11.1(a) (Docket No. 25). Because the Bond payments are cloaked in the garb of "lease" payments and failure to make payments constitutes a default under both such arrangements, this "cross-default" hinders United's ability to assume its lease at Denver and is unenforceable pursuant to Section 365(f) of the Bankruptcy Code. A finding that the Financing Portions and Lease Portions are severable would not only comport with state law, including Ordinance 626 which requires a separate lease and financing agreement, but also with federal bankruptcy law which prevents restrictions on assignment and assumption.

## G.   **CONCLUSION**

Whether an agreement is a true lease turns on the economic substance of the agreement, not the form of the transaction. There is no dispute that the Special Facilities and Ground Lease contains provisions expressly dedicated to financing. These terms provide only for United's payment on debt service on the Bonds, as discussed in full above, and bear no relation to the compensation paid for United's use and occupancy of the facilities and the ground.

Applying the economic substance factors to the Financing Portions of the Special Facilities and Ground Lease overwhelmingly supports a finding that they represent a financing arrangement rather than a true lease subject to Section 365. First, the Financing Portions do not establish United's right to use and occupy property at the Denver Airport. Instead, their sole purpose was to provide the necessary financing to acquire, build, and equip the Denver Airport Projects. Second, the "Facilities Rentals" United pays in connection with the Bonds are precisely equal to the debt service payable on the Bonds, not the fair market value of the property

24

United uses at the Denver Airport. Third, the City took title to the facilities specifically for United's exclusive use and benefit. Fourth, the Financing Portions of the Special Facilities and Ground Lease were structured as they were to obtain low cost financing in the form of tax-exempt bonds. Fifth, United has taken on many of the burdens typically reserved for the lessor, rather than the lessee. And, finally, upon completion of the financing, United has the opportunity to obtain the same interest in the facilities that it had prior to the financing, i.e., a leasehold interest. As a result, the economic substance of the Financing Portions of the Special Facilities and Ground Lease reflects a financing arrangement rather than a "true lease" to which Section 365 would apply.

Both state and federal law mandate that the Special Facilities and Ground Lease should be severed into a separate lease agreement and financing agreement. Accordingly, this Court should find that the Financing Portions of the Special Facilities and Ground Lease constitute a financing arrangement to which Section 365 of the Bankruptcy Code does not apply, and find that the Special Facilities and Ground Lease is severable into its Lease Portions and Financing Portions.

Dated: Chicago, Illinois
        June 10, 2004

Respectfully Submitted

James H. M. Sprayregen, P.C. (ARDC No. 6190206)
Marc Kieselstein (ARDC No. 6199255)
Todd Gale (ARDC No. 6229288)
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, Illinois 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel for Plaintiff / Appellant
United Air Lines, Inc.

25

## CERTIFICATE OF SERVICE

I, Christopher L. McCall, certify that on the 10th day of June 2004, I caused to be served, by e-mail, facsimile, courier or overnight mail, a true and correct copy of the foregoing BRIEF OF APPELLANT UNITED AIR LINES, INC., on the parties on the attached service list.

Dated: June 10, 2004

Christopher L. McCall

| | |
|---|---|
| William B. Kannell<br>Timothy J. Langella<br>George Hofman<br>Colleen A. Murphy<br>Mintz, Levin, Cohn, Ferris, Glovsky and<br>Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111 | Mark F. Hebbeln<br>Gary W. Garner<br>Harold Kaplan<br>Gardner, Carton & Douglas, LLP<br>191 North Wacker Drive<br>Suite 3700<br>Chicago, Illinois 60606-1698 |
| Douglas W. Jessop<br>Kerstin Cass<br>Jessop & Company, P.C.<br>303 East 17th Avenue<br>Suite 930<br>Denver, Colorado 80203-1264 | Andrew M. Schauer<br>Krys Boyle, P.C.<br>600 Seventeenth Street<br>Suite 2700 South Tower<br>Denver, Colorado 80202 |

# CORE GROUP SERVICE LIST

| | |
|---|---|
| Debtors:<br>United Air Lines, Inc.<br>WHQLD<br>1200 East Algonquin Road<br>Elk Grove Village, Illinois 60007<br>Attn: John Lakosil<br>Phone: (847) 700-4462<br>Facsimile: (847) 700-4683 | Counsel to Debtors and Debtors in Possession:<br>Kirkland & Ellis<br>200 East Randolph Street<br>Chicago, Illinois 60601<br>Attn: James H.M. Sprayregen, P.C.<br>Marc Kieselstein<br>David R. Seligman<br>Steven Kotarba<br>Phone: (312) 861-2000<br>Facsimile: (312) 861-2200 |
| Office of the United States Trustee:<br>227 West Monroe Street, Suite 3350<br>Chicago, Illinois 60606<br>Attn: Ira Bodenstein<br>Kathryn Gleason<br>Stephen Wolfe<br>Phone: (312) 886-5785<br>Facsimile: (312) 886-5794 | Counsel to the Debtors' debtor in possession<br>lender (Bank One):<br>Latham & Watkins<br>233 South Wacker Drive, Suite 5800<br>Chicago, Illinois 60606<br>Attn: David Heller<br>Timothy Barnes<br>Phone: (312) 876-7700<br>Facsimile: (312) 993-9767 |
| Counsel to the Debtors' debtor in possession<br>lender (CIT Group):<br>Schulte, Roth & Zabel<br>919 Third Avenue<br>New York, New York 10022<br>Attn: Robert J. Mrofka<br>Phone: (212) 756-2000<br>Facsimile: (212) 593-5955 | Counsel to the Debtors' debtor in possession<br>lender (Citibank and JP Morgan):<br>Morgan, Lewis & Bockius, LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attn: Richard S. Toder<br>Jay Teitelbaum<br>Phone: (212) 309-6000<br>Facsimile: (212) 309-6001 |
| Counsel to the Debtors' debtor in possession<br>lender (Citibank and JP Morgan):<br>Kaye Scholer, LLP<br>3 First National Plaza, Suite 4100<br>70 West Madison Street<br>Chicago, Illinois 60602<br>Attn: Michael B. Solow<br>Phone: (312) 583-2300<br>Facsimile: (312) 583-2360 | Debtors' Private Copy Service:<br>Merrill Corporation<br>250 South Wacker Drive, 4th Floor<br>Chicago, Illinois 60606<br>Attn: Allison Clark<br>Phone: (312) 930-2123<br>Facsimile: (312) 454-8564 |
| Official Notice and Claims Agent:<br>Poorman-Douglas Corporation<br>10300 SW Allen Boulevard<br>Beaverton, Oregon 97005<br>Attn: Rhonda G. McNally<br>Phone: (503) 277-7999<br>Facsimile: (503) 350-5230 | Counsel to Committee:<br>Sonnenschein, Nath & Rosenthal<br>8000 Sears Tower<br>233 S. Wacker Drive<br>Chicago, Illinois 60604<br>Attn: Fruman Jacobson<br>Robert E. Richards<br>Phone: (312) 876-8123<br>Facsimile: (312) 876-7934 |
| Counsel to Committee:<br>Sonnenschein, Nath & Rosenthal<br>1221 Avenue of the Americas<br>24th Place<br>New York, New York 10020<br>Attn: Carole Neville<br>Phone: (212) 768-6889<br>Facsimile: (212) 768-6800 | |